**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DONALD M. HAY** | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | Case No. |
| **FAF, INC., C BAR P TRUCKING INC.,** | ) | |
| **ALI A. GABABA, ALI HUSSEIN and** | ) | |
| **ERNESTO PENALOZA-GONZALEZ** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

## COMPLAINT

Comes Now Plaintiff and for his complaint alleges as follows:

## I. PARTIES AND JURISDICTION.

1. Plaintiff is an individual and a citizen of Missouri, residing in Independence, Missouri.

2. Defendant FAF, Inc. (hereinafter "FAF") is a corporation organized under the laws of Ohio.

3. Defendant C Bar P Trucking Inc. (hereinafter "C Bar P") is a corporation organized under the laws of Kansas.

4. Defendants Ali A. Gababa (hereinafter "Gababa") and Ali Hussein (hereinafter "Hussein") are individuals and believed to be citizens of Georgia.

5. Defendant Ernesto Penaloza-Gonzalez (hereinafter "Penaloza-Gonzalez") is an individual and a citizen of Kansas.

6.  FAF, Gababa and Hussein transacted business in this state and one or more of them committed one or more tortious acts in this state. Under K.S.A. 60-308, this Court has in personam jurisdiction over said defendants.

7.  The amount in controversy, exclusive of interest and costs, exceeds the amount specified by 28 U.S.C. § 1332. Jurisdiction based on diversity of citizenship and amount in controversy exists in this case. Venue is proper in this District.

## II. GENERAL ALLEGATIONS.

8.  This case arises from injuries plaintiff sustained on January 22, 2016 in a night-time crash involving three tractor-trailers which happened on a dark unlit section of the Kansas Turnpike (hereinafter "Turnpike") in Chase County, Kansas.

9.  Tractor-trailers can weigh more than 80,000 pounds fully loaded. The potential for serious or fatal injuries in truck crashes is obvious.

10. Crashes involving tractor-trailers and other large trucks cost thousands of lives and cause tens of thousands of injuries annually in the United States. Public safety requires that they be operated safely.

11. FAF and C Bar P are and, were for all times herein material motor carriers operating under authority from the Federal Motor Carrier Safety Administration, (hereinafter "FMCSA"), and are required to comply with the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 325 et seq. (hereinafter "FMCSRs") and/or the Kansas Motor Carrier Regulations.

12. To operate a tractor-trailer in interstate commerce drivers are generally required to possess a commercial driver's license (hereinafter "CDL"). To obtain a CDL drivers are required to have the knowledge and driving skills necessary to safely operate a commercial motor vehicle as set forth in Federal Motor Carrier Safety Regulation (hereinafter "FMCSR") § 383.111 and 383.113.

13. For all times herein material Gababa, Hussein and Penaloza-Gonzalez were professional truck drivers who possessed CDLs.

14. FMCSR § 392.1 required FAF and C Bar P to instruct their drivers, specifically, Gababa, Hussein and Penaloza-Gonzalez concerning the FMCSRs and make sure that they complied with them.

### III. THE LOCATION.

15. The Turnpike (also designated Interstate 35) at or about the location of this crash is a north-south interstate highway consisting of two northbound and two southbound travel lanes separated by a cement barrier wall. Vehicles enter and exit the Turnpike through toll facilities at specific locations along the highway.

16. On January 22, 2016 at about 9:30 p.m. the Turnpike at or about milepost 107 was dark and unlit. The speed limit at this location was 75 mph.

17. K.S.A. 8-1410 defines "controlled access highway" as follows: "Controlled-access highway" means every highway, street or roadway in respect to which owners or occupants of abutting lands and other persons have no legal right of access to or from the

same, except at such points only and in such manner as may be determined by the public authority having jurisdiction over such highway, street or roadway.

18. The Turnpike was and is such a controlled access highway at the location of the operative facts in this case.

19. K.S.A. 8-1524(h) prohibits stopping, standing or parking vehicles on the right-of-way of controlled access highways, except for certain specified circumstances like stopping of disabled vehicles, emergencies, illness or incapacity of the driver or directions of law enforcement or emergency personnel.

20. This includes the shoulders of the Turnpike as they are considered are part of the Turnpike right-of-way. *Flax v. Kansas Turnpike Authority, 226 Kan. 1 (1979).*

21. K.S.A. 8-1524 (f) makes it illegal to drive any vehicle onto or from any controlled-access highway except at such entrances and exits.

22. The Turnpike contains a number of rest areas in proximity to the location of this crash including ones located at Emporia and Matfield Green where drivers can legally and safely pull off the road and take breaks.

## COUNT I.

## THE CRASH-
## NEGLIGENCE, NEGLIGENCE PER SE, RECKLESSNESS,
## WANTONNESS OR DISREGARD FOR THE SAFETY OF OTHERS.

COMES Now plaintiff and for his first cause of action states and alleges as follows:

23. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 22 above.

### I. FAF TRUCK WITH A FALSIFIED LOG
### ILLEGALLY PULLS ONTO THE SHOULDER.

24. On or about January 22, 2016, at approximately 9:37 p.m. Gababa and Hussein were employees and/or contractors of FAF. Regardless of their status under state law, under FMCSR § 390.5, they were classified as employees and were acting within the scope of their employment.

25. On or about January 22, 2016, at approximately 9:37 p.m. Gababa and Hussein were, within the scope of their employment, co-driving a FAF tractor-trailer heading south on the Turnpike.

26. Gababa and Hussein, as co-drivers, were engaged in a joint venture, or joint enterprise.

27. The FAF truck had a gross vehicle weight of 80,000 pounds and was easily capable of causing death or serious injury if not operated safely.

28. While the evidence is somewhat conflicting, it is believed that Gababa was driving the FAF truck.

29. FMCSR § 395.3 contains "hours-of-service" rules. Under FMCSR § 395.3 commercial motor vehicle drivers are limited to being on duty for 14 consecutive hours and are limited to 11 hours of actual driving during this time.

30. The hours-of-service rules exist in part to reduce the risk caused by fatigued drivers operating commercial vehicles.

31. On or about January 22, 2016, at approximately 9:37 p.m. Gababa had driven in excess of the time permitted by FMCSR § 395.3.

32. To enforce and verify compliance with the hours-of-service rules, FMCSR § 395.8 requires, with limited exceptions, that drivers of commercial motor vehicles maintain log records of their on-duty time, off-duty time, driving time and other items.

33. The FAF truck was equipped with an electronic logging device to comply with these requirements.

34.  Not only was Gababa violating the hours-of-service rules, but **a Kansas Highway Patrol post-accident inspection of the FAF truck determined that it's electronic log had been falsified.** A portion of the Kansas Highway Patrol report concerning this is reproduced below:

> The driver of Unit 1, Gababa, was found to be operating with a false record of duty status at the time of the crash.  As of 2227 hours Eastern Time, Gababa's log reflected sleeper birth.  The crash occurred at 2137 hours Central Time while Gababa was driving the vehicle.  The on board electronic logging device in Unit 1 had been changed to reflect that the co-driver, Hussein, was on duty conducting a pre-trip inspection as of 2228 hours Eastern Time.  The driver violation of 49CFR 395.8(e). was not reflected on the inspection report.  This was due to the violation not being discovered prior to the inspection being delivered to the carrier.

35. Allegedly because Gababa was out of driving hours, Gababa and Hussein allegedly decided to switch drivers with Hussein to start driving.

36. While the evidence is somewhat in conflict, it appears that the semi may have pulled off the road and onto the shoulder. This required reducing the truck's speed.

37. Leaving the highway and parking or standing on the shoulder, in this circumstance violated K.S.A. 8-1524.

38. Federal Motor Carrier Safety Regulation, hereinafter "FMCSR" § 392.2, provides in part:

§ 392.2 Applicable operating rules.

Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated.............

39. Gababa's violation of K.S.A. 8-1524 violated "laws, ordinances and regulations of the jurisdiction" and consequently violated FMCSR § 392.2.

40. There were safe and legal alternatives to this choice, to wit: rest areas at Emporia and Matfield Green where the handoff could have been safely and legally done.

41. It appears that Hussein did not take over driving. Instead, it appears that Gababa continued to drive even though he was out of driving hours.

42. While the evidence is somewhat in conflict, it appears that the semi may have, pulled back onto the right lane of the dark, unlit 75 mile-per-hour roadway at less than highway speed, creating a traffic hazard and violation of K.S.A. 8-1524.

43.  Whether the FAF semi was slowing down to go onto the shoulder or reentering the highway from the shoulder at a reduced speed, it engaged in a dangerous and illegal act and in so doing created a traffic hazard.

## II. C BAR P TRUCK
## REAR-ENDS FAF TRUCK
## IN THE RIGHT LANE.

44. On or about January 22, 2016, at approximately 9:37 p.m. Penaloza-Gonzalez was an employee and/or contractor of C Bar P. Regardless of his status under state law, under FMCSR § 390.5, he was classified as an employee and was acting within the scope of his employment.

45. At or about the same time and place, a truck operated by C Bar P and driven by Penaloza-Gonzalez was behind the FAF truck heading south in the **right** lane of the Turnpike

46. The C Bar P truck had a gross vehicle weight of 80,000 pounds and was easily capable of causing death or serious injury if not operated safely.

47. K.S.A. 8-1523 requires drivers not follow another vehicle more closely than is reasonable and prudent, considering the speed of the vehicles, the traffic on and condition of the highway.

48. K.S.A. 8-1523(b) generally requires truck drivers when traveling on a roadway outside of a business or residence district which is following another truck to leave

sufficient space, whenever conditions permit, so that an overtaking vehicle may enter and occupy such space without danger.

49. It appears that Penaloza-Gonzalez failed to comply with one or both of these requirements.

50. Kansas Administrative Regulation (hereinafter "K.A.R.") 82–4–3h adopted FMCSR § 392.2, with minor changes not material to this case, as part of the Kansas Motor Carrier Regulations.

51. Penaloza-Gonzalez violated FMCSR § 392.2 and/or K.A.R. 82–4–3h.

52. The Kansas Highway Patrol accident report indicates that Penaloza-Gonzalez was inattentive to his driving.

53. At highway speed the C Bar P truck crashed into the rear of the FAF truck causing dramatic damage as can be seen in the photographs below:





54. In so doing, Penaloza-Gonzalez, within the course of his employment with C Bar P, failed to maintain a proper lookout, failed to follow at a distance as required by K.S.A. 8-1523, was inattentive to his driving and otherwise failed to comply with applicable standards of care.

### III. HAY REACTS QUICKLY BUT HIS PATH TO SAFETY IS BLOCKED.

55.  At or about the same time and location Plaintiff was driving a tractor-trailer in the right lane following the C Bar P truck at a distance.

56. The C Bar P truck was carrying a load of powdered product. When the C Bar P truck rear ended the FAF truck, the force of the collision caused part of its load to become airborne, causing a powder cloud to envelop the scene, further seriously obstructing plaintiff's visibility on the already dark unlit highway.

57. Notwithstanding this, plaintiff was able to understand that there was danger ahead and quickly took evasive action.

58. To avoid the wreck in the right lane Plaintiff, carefully steered his truck into the left lane and braked.

59. The Kansas Highway Patrol forensic map report indicates the force of the impact caused the FAF truck's trailer to enter the **left** lane of the highway obstructing plaintiff's path to safety.

60. Despite his quick reaction and evasive action, plaintiff's truck collided with the FAF truck obstructing his lane and caused his truck to crash into the cement barrier wall.

61. Plaintiff's truck sustained major damage as is evident from the following photograph:



62. As a direct and proximate result of this crash Hay sustained multiple injuries, including injuries to his neck, shoulder and back. He has required two surgeries and over a year of medical treatment.

63.  Hay has experienced and continues to experience pain, suffering, disability and the quality of his life was, is and will be diminished.

64. On account of his injuries, Hay has required and incurred expenses for medical care and treatment of over $158,000 at "sticker price" and will incur additional medical expenses in the future.

65. On account of the injuries sustained in the crash Hay was off work for over a year during which time he lost wages of more than $67,000.

66.  Prior to the crash Hay was a full-time over-the-road truck driver.

67.  Due to pain and limitations caused by his injuries Hay has been unable to handle the physical demands required of a full-time over-the-road truck driver.  Accordingly, he has and, will into the future, suffer a reduction in income estimated to exceed $100,000.

68. Penaloza-Gonzalez was also injured, perhaps seriously, in the crash.  Given the damage to his semi it would be surprising if he wasn't.

69.  Scene photographs indicate that his air-bag deployed and depict what appears to be blood in the cabin of his truck. It's plaintiff's understanding that he was transported from the scene by ambulance.

## IV. GABABA AFTER THE CRASH.

70. It appears that Gababa was not seriously injured, if at all, in the crash. He was readily able to walk around the crash scene, converse, and even get involved in an altercation with the Kansas Highway Patrol Trooper investigating the crash as will be detailed below.

K.S.A. 8-1604(a)(1)(2) states:

**8-1604. Duty of driver to give certain information after accident; failure to provide proof of liability insurance or financial security; duty to render aid after accident; proof of liability insurance or financial security by electronic means, restrictions**

(a)(1) The driver of any vehicle involved in an accident resulting in injury to or death of any person, or damage to any attended vehicle or property, shall………….

(2) Such driver, insofar as possible, shall immediately make efforts to determine whether any person involved in such accident was injured or killed, and shall render to any person injured in such accident reasonable assistance, including the carrying, or the making of arrangements for the carrying of such person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that such treatment is necessary, or if such carrying is requested by the injured person.

71. Gababa did not render assistance to Hay or Penaloza-Gonzalez as required by the above statute. Rather, he concocted a story to cover-up his hours of service violations and log falsification, as will be detailed below.

72. Given the serious nature of this crash and the injuries sustained by Hay and Penaloza-Gonzalez this reflects disregard for the safety of others.

73. As a violation of K.S.A. 8-1604 it also violates FMCSR§ 392.2.

74. Kansas Highway Patrol Trooper Brame interviewed Gababa at the scene. Gababa denied that he was driving the FAF truck when it became involved in the crash.  He claimed that Hussein, his co-driver was driving.  Hussein indicated that he was in the sleeper bed and contradicted Gababa's story.

75. Gababa's interaction with Trooper Brame did not go well and resulted in Gababa ending up on the ground in handcuffs.

76. According to the Kansas Highway Patrol accident report several days later Trooper Brame spoke with Gababa. Trooper Brame indicates that Gababa admitted driving the FAF truck when it was involved in the wreck.

77. K.S.A. 21-5904(a)(1)(C) provides:

**21-5904. Interference with law enforcement**

(a) Interference with law enforcement is:

(1) Falsely reporting to a law enforcement officer, law enforcement agency or state investigative agency:

(C) any information, knowing that such information is false and intending to influence, impede or obstruct such officer's or agency's duty; or

78.  Rather than assist the injured and cooperate with the crash investigation, Gababa chose to occupy the limited law enforcement resources on the scene first with a failed attempt to cover-up his hours-of-service violation, log falsification and then become involved in an altercation with Trooper Brame.

79. This violates K.S.A. 21-5904, FMCSR§ 392.2 and reflects disregard for the safety of others.

80. Defendants were negligent, and/or acted with recklessness, disregard for the safety of others or wantonness and are liable to plaintiff for his injuries.

81. Plaintiff is entitled to judgment against defendants.

WHEREFORE, plaintiff prays for judgment against defendants for compensatory and punitive damages an amount in excess of $ 75,000, his costs herein expended and incurred and such other and further relief as the Court may deem just and equitable.

## COUNT II.

### FAF AND C BAR P'S SAFETY PRACTICES, HIRING, TRAINING, RETENTION AND SUPERVISION – NEGLIGENCE, NEGLIGENCE PER SE, RECKLESSNESS, WANTONNESS OR DISREGARD FOR THE SAFETY OF OTHERS.

COMES Now plaintiff and for his second cause of action states and alleges as follows:

82. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 81 above.

83. FMCSR § 392.1 requires that motor carriers, their officers, agents, representatives and employees with responsibility for management, maintenance, operation or driving of commercial motor vehicles be taught and comply with the FMCSRs.

84. Under Kansas law employers have a duty to exercise reasonable care in the hiring, training, supervision and retention of employees.

-16-

85. This court has recognized that deficient safety practices by a trucking company and/or its drivers may support a claim for punitive damages. *Stewart v. Mitchell Transport*, 241 F. Supp.2d 1216 (D. Kan, 2002)

86. The FMCSA is the federal agency primarily responsible for motor carrier safety. It's core mission is to prevent crashes, injuries, and fatalities involving large trucks and buses.

87. In furtherance of this mission FMCSA has adopted the FMCSRs and put in place a comprehensive program of inspections, enforcement and resources designed to further its mission of reducing crashes, deaths and injuries.

### I. FAF'S SAFETY HISTORY.

88. FAF has a history of crashes, excessive crash risk and safety violations.

89. In February, 2011 FMCSA sent FAF a "warning letter" advising them that safety data indicated a lack of compliance with motor carrier safety regulations and that their safety performance concerning crashes had fall into an unacceptable level.

90. As just one example, FMCSA data reflects hundreds of violations of FMCSR § 392.2 by FAF drivers of including reckless driving, speeding, following too close, inattentive driving, improper lane change, improper passing, disobeying traffic control devices, among others.

91. Gababa's conduct is consistent with this pattern. He committed one or more violations of FMCSR § 392.2 as alleged in Count I above.

92.  Violations of FMCSR § 392.2 are classified as "critical violations". The FMCSA considers critical violations to be indicators of inadequate safety management controls and usually higher than average accident rates.

93. Log falsification, as prohibited by FMCSR § 395.8(e), is also classified as a "critical violation". The Kansas Highway Patrol determined that the FAF truck's electronic log have been falsified.  This is consistent with FAF's safety record which includes a number of other incidents of log falsification.

94. After receiving the March, 2011 warning letter, it appears that FAF improved its safety performance to reduce its risk of being involved in crashes. By the summer of 2013 FAF dramatically reduced its crash risk, as measured by FMCSA data.

95. This demonstrates that FAF is capable of managing its safety performance and reducing the risk its trucks pose to the traveling public.

96.  Unfortunately, shortly thereafter, FAF appears to have reversed course.  In early 2014 through December, 2015, shortly before this crash, FAF's crash risk, as measured by FMCSA data, became dramatically worse increasing to a level much higher than it was when the March, 2011 warning letter was sent.

97. This suggests that FAF made management and/or operational choices which dramatically increased the risk it's trucks posed to the traveling public.

98. The results of FAF's choices can be measured in injury and suffering.  The crash involved here was one of more than 200 crashes that FAF trucks were involved in from November, 2015 through November, 2017 according to FMCSA data.

99. At least 8 deaths and more than 100 injuries resulted from these crashes according to FMCSA data.

100. The conduct alleged in paragraphs 88 through 99 reflects negligence, negligence per se, recklessness, wantonness or disregard for the safety of others with regard to hiring, training, retention, supervision and safety practices.

## II. C BAR P'S SAFETY HISTORY.

101. C Bar P is a smaller company than FAF and plaintiff has less detailed information about safety practices at C Bar P than FAF.  However, FMCSA data demonstrates a clear history of safety problems at C Bar P.

102. In November, 2009 FMCSA conducted a safety review of C Bar P.  The review was triggered by deficient safety performance concerning crashes and driver fatigue.

103. Recommendations for safety improvements were made. Notwithstanding this safety problems continued at C Bar P.

104. In February, 2012 FMCSA sent C Bar P a "warning letter" advising them that safety data indicated a lack of compliance with motor carrier safety regulations and that their safety performance concerning crashes had fall into an unacceptable level.

105.  In the February, 2012 warning letter FMCSA urged C Bar P to the take the warning letter seriously and improve its safety record.  FMCSA told them that continued poor safety performance could result in penalties like revocation of their operating authority.

106. Despite the November, 2009 safety review and February, 2012 warning letter safety problems continued at C Bar P.

107. In March, 2015 FMCSA sent C Bar P another "warning letter" this time advising them that safety data indicated a lack of compliance with motor carrier safety regulations and that their safety performance concerning hours-of-service compliance had fall into an unacceptable level.

108. Truck driver fatigue is a known risk factor for crashes. Therefore, the deficient performance repeatedly identified by FMCSA, as alleged above, could easily have been causal factors in the crash which is the subject of this action.

109.  The conduct alleged in paragraphs 88 through 108 reflects negligence, negligence per se, recklessness, wantonness or disregard for the safety of others with regard to hiring, training, retention, supervision and safety practices by FAF and/or C Bar P and likely contributed to causing the crash and plaintiff's injuries as alleged above.

110.  Plaintiff is entitled to judgment against FAF and C Bar P.

WHEREFORE, plaintiff prays for judgment against FAF and C Bar P for compensatory and punitive damages an amount in excess of $ 75,000, his costs herein expended and incurred and such other and further relief as the Court may deem just and equitable.

## COUNT III.

## K.S.A. 66-176 STATUTORY DAMAGES AND ATTORNEY FEES.

COMES Now plaintiff and for his third cause of action states and alleges as follows:

111.  Plaintiff realleges and incorporates by reference paragraphs 1 through 110 above.

112. K.S.A. 66-176 provides:

> Any public utility or common carrier which violates any of the provisions of law for the regulation of public utilities or common carriers shall forfeit, for every offense, to the person, company or corporation aggrieved thereby, the actual damages sustained by the party aggrieved, together with the costs of suit and reasonable attorney fees, to be fixed by the court. If an appeal is taken from the judgment or any part thereof, it shall be the duty of the appellate court to include in the judgment additional reasonable attorney fees for services in the appellate court or courts.

113. FAF, by and through its agents, servants or employees committed multiple FMCSR violations including, but not limited to, FMCSR § 392.2, FMCSR § 395.3 and FMCSR § 395.8.

114. C Bar P, by and through its agents, servants or employees, violated one or more FMCSRs including but not limited to FMCSR § 392.2 and/or Kansas Administrative Regulation 82–4–3h as alleged above.

-21-

115. These are provisions of law for the regulation of common carriers as referred to in K.S.A. 66-176.

116. Under K.S.A. 66-176 plaintiff is entitled to judgment for actual damages, attorney's fees and costs.

**WHEREFORE**, plaintiff prays for judgment against defendant for an amount in excess of $75,000, reasonable attorney fees, his costs herein expended and incurred and such other and further relief as the Court may deem just and equitable.

s/ Lawrence D. Flick
Lawrence D. Flick
KS Bar # 11162; MOBAR# 67906
Flick Law Firm
7500 College Blvd., Suite 526
Overland Park, Kansas 66210
Telephone: (913) 648-7000
Facsimile:   (913) 648-7080
E-mail:       lflick@flicklawfirm.com
Attorney for Plaintiff

## JURY DEMAND

Plaintiff requests trial by jury on all issues so triable.

s/ Lawrence D. Flick

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial of this action.

s/ Lawrence D. Flick